No. 55,963

STATE OF KANSAS, *Plaintiff-Appellant*, v. TIMOTHY RAY HOWARD and ROSEMARIE HOWARD, *Defendants-Appellees*.

(679 P.2d 197)

Opinion filed March 24, 1984.

*David E. (Rick) Roberts*, assistant county attorney, argued the cause, and *Robert T. Stephan*, attorney general, and *Timothy J. Chambers*, county attorney, were with him on the brief for the appellant.

*Herbert R. Hess, Jr.*, of Hess, Leslie & Brown, of Hutchinson, argued the cause and was on the brief for the appellees.

The opinion of the court was delivered by

PRAGER, J.: This is a criminal action in which the defendants, Timothy Ray Howard and Rosemarie Howard, were charged with possession of cocaine (K.S.A. 65-4127a) and conspiracy to sell marijuana (K.S.A. 21-3302 and K.S.A. 1982 Supp. 65-4127b). The State has taken an interlocutory appeal, pursuant to K.S.A.

22-3603, from an order of the district court suppressing certain taped conversations and other evidence obtained by the police authorities following a search of the defendants' house in Hutchinson. The district court held that the interception of defendants' cordless telephone conversations and the tape recording thereof were in violation of Title III of the Omnibus Crime Control and Safe Streets Act of 1968 which may be found at 18 U.S.C.A. § 2510 *et seq.*

For purposes of this appeal, the facts are undisputed and were found by the trial court to be as follows: A neighbor of defendants, referred to in the record as a confidential informant, was operating his AM/FM radio and, in the process of turning the tuning dial, suddenly began to hear conversations over the radio. He determined that the voices were those of the defendants who were conversing with others through use of a cordless telephone. The radio receiver in question was a standard make and model and had not been modified in any manner to monitor or intercept defendants' conversations. The radio was located at all times within the physical confines of the informant's residence without the knowledge of and without direction from law enforcement officers. The informant tape recorded one or more of these conversations. He then provided information about the conversations to law enforcement officers who directed the information to Floyd Bradley, a Kansas Bureau of Investigation (KBI) agent. The conversations were of interest to the KBI, because they involved narcotic drugs. Bradley provided the informant with a tape recorder and a number of blank tapes, requesting the informant to record any further conversations heard over the radio and to record the time of the conversations. Law enforcement officers then obtained court authorization to install a pen register on defendants' telephone. A pen register is a mechanical device which records only the numbers dialed on a telephone by monitoring the electrical impulses caused by use of the telephone's dial or push buttons, but which does not overhear oral communications or indicate whether calls are actually completed. The records maintained by the informant as to the times of recorded conversations corresponded with the records maintained by the pen register. All calls recorded by the informant originated in the home of the defendants. The parties stipulated that the recordings made by the confidential informant were not

obtained with the consent of either defendant or the consent of other parties to the conversations. The law enforcement authorities did not obtain an order from a court authorizing them to monitor or record the conversations originating from defendants' residence.

The informant recorded conversations of defendants from July 13, 1982, until August 21, 1982. Based primarily upon the information received from the tape recordings, a search warrant was obtained to search defendants' residence for the cordless telephone in question as well as items of contraband. This search warrant was also based in part upon recordings of the pen register mentioned above and personal observations of the movements of the defendants. Agent Bradley testified that he would not have attempted to obtain a search warrant based solely upon the first tape recordings prepared by the confidential informant which were obtained without the police officers' knowledge or involvement. The search warrant was executed, and the search disclosed a cordless telephone and certain narcotic drugs which were seized by law enforcement personnel within the defendants' residence.

At the hearing on the motion to suppress, James Hutchison, an employee of Carden's Radio Shack in Hutchinson, testified as to the nature and operational dynamics of the cordless telephone. The cordless telephone was manufactured by the Radio Shack Corporation. It works much like a CB radio. It consists of a base unit and a mobile unit. The base unit is physically attached to two separate wires, one of which is the land based telephone line and the second of which is an AC power source. The mobile unit is a self-contained unit with its own batteries which are recharged when the mobile unit is physically rested upon the base unit. No cord or line or physical connection of any kind exists between the mobile unit and the base unit. The mobile unit is much like a conventional telephone and one can both hear from and speak into the mobile unit. Communication between the base unit and the mobile unit takes place through the reception and transmission of FM radio signals by both the base and mobile units.

At the hearing, defendants introduced into evidence the owner's manual for the cordless telephone. Hutchison testified that an average customer would be able to determine from the

manual that the device in question was a radio transmitter and receiver. He based this conclusion upon the information contained in the manual. The manual sets forth the transmitted frequencies and the received frequencies of both the base unit and the portable handset. The manual differentiates between the telephone and radio aspects of the cordless telephone by separating the telephone specifications from the radio transmission and reception specifications. Reference is made to the "antenna" of the mobile unit. The mobile and base unit communicate with each other by means of FM radio signals. The FM signal utilized by both the mobile and base units is the same as any other FM signal and is not specialized in any way. The FM signal utilized is of the same or similar frequency utilized by commercial FM radio stations. A standard FM radio would be able to pick up the radio transmissions from both the mobile and base units of the cordless telephone.

The FM signal transmitted from either the base or mobile unit is nondirectional and will reach out in all directions simultaneously. The FM signal transmitted will penetrate and pass through almost any material, including a normal concrete or wooden wall. The effective rated range of communication between a mobile and base unit is approximately 50 feet, but this range varies with the physical surroundings in which the particular cordless telephone is situated. The range varies with the physical surroundings, weather conditions, the sensitivity of the receiver, and the power output of the transmitter. The manual states that, although the cordless telephone is designed for a normal range of 50 feet, the range can vary from anywhere between 30 feet to 100 feet depending upon the particular surroundings.

The manual states that "walkie-talkies" can share the same frequencies of the cordless telephone which can produce some interference. If two cordless telephones were hooked to separate lines and were physically close enough, calling one telephone would cause the second telephone to ring and both telephones would be privy to the same conversation. The only way to correct this situation would be to return the cordless telephone to its place of manufacture for frequency modifications. The cordless telephone in question is required to pass Federal Communications Commission regulations which are limited to compliance

with production specifications and not transmission capabilities. One is not required to have a license to operate either the base or the mobile unit because the power of each unit is less than one watt. Hutchison testified that the hand-held mobile unit contains a "confidential" button. When that button is depressed, a person holding the telephone could talk to others in the immediate vicinity without having his voice broadcast over the hand-held unit. This would also allow the operator of the hand-held unit to hear incoming transmissions but not to broadcast from the unit.

The trial court adopted the above facts with additional findings that the conversations taped initially by the neighbor, which were delivered to agent Bradley, would not have been sufficient for the issuance of a search warrant in the case, and that all recorded conversations of the defendants took place while the defendants were in their private residence and talking on the cordless telephone installed in that residence. The trial court, in suppressing the evidence, held that Title III of the Omnibus Crime Control and Safe Streets Act of 1968 controlled the result in this case and that the provisions of the act were violated so as to require suppression of the evidence. The parties to the appeal are in agreement that Title III is controlling and that its provisions must be applied in this case.

At the outset, it would be helpful to briefly summarize the provisions of Title III which may be found at 18 U.S.C.A. § 2510 *et seq.* The Kansas statutes, K.S.A. 22-2514 *et seq.*, covering eavesdropping and wiretapping, have incorporated specifically and comply with the provisions of Title III. 18 U.S.C.A. § 2510 is the definition section and defines the key terms. It provides in part as follows:

"§ 2510. **Definitions**

"As used in this chapter —

"(1) 'wire communication' means *any communication made in whole or in part* through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception furnished or operated by any person engaged as a common carrier in providing or operating such facilities for the transmission of interstate or foreign communications;

"(2) 'oral communication' means any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation;

. . . .

"(4) 'intercept' means the aural acquisition of the contents of any wire or oral

communication through the use of any electronic, mechanical, or other device.

"(5) 'electronic, mechanical, or other device' means any device or apparatus which can.be used to intercept a wire or oral communication other than —

"(a) any telephone or telegraph instrument, equipment or facility, or any component thereof, (i) furnished to the subscriber or user by a communications common carrier in the ordinary course of its business and being used by the subscriber or user in the ordinary course of its business; or (ii) being used by. a communications common carrier in the ordinary course of its business, or by an investigative or law enforcement officer in the ordinary course of his duties;

"(b) a hearing aid or similar device being used to correct subnormal hearing to not better than normal;

. . . .

"(11) 'aggrieved person' means a person who was a party to any intercepted wire or oral communication or a person against whom the interception was directed."

Section 2511 prohibits the unlawful interception or disclosure of wire or oral communications and provides a penalty of fine or imprisonment for violation of the section. Section 2512 prohibits the manufacture, distribution, possession, and advertising of wire or oral communication intercepting devices. Section 2513 provides for the confiscation of wire or oral communication intercepting devices. Section 2515 prohibits the use of evidence of intercepted wire or oral communications in the following language:

"Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter."

Sections 2516 through 2519 provide a procedure for the obtaining of judicial authority for the interception of wire or oral communications, for the disclosure and use of such communications, and for the making of reports concerning such communications. Section 2520 provides that any person whose wire or oral communication is intercepted, disclosed, or used in violation of this chapter shall have a civil cause of action and may recover damages against any person who violates the provisions of the act. It should also be noted that specific exceptions are set forth throughout the definitional section, 18 U.S.C.A. § 2510, and throughout the balance of Title III which provide that certain types of interceptions will not be deemed unlawful. In cases where the issue of the application of Title III is involved, the

standard procedure is for the court to first proceed to examine the facts in light of the definitions found at 18 U.S.C.A. § 2510. Once this examination has been made, the court then determines whether or not an improper form of interception has taken place.

There are a number of cases which discuss the purpose of Title III and the ends which Congress sought to achieve thereby. In *United States v. Carroll*, 332 F. Supp. 1299 (D.C. Cir. 1971), it is stated that Title III was intended to deal with increasing threats to privacy resulting from the growing use of sophisticated electronic devices and the inadequacy of the limited prohibitions contained in the early communications act, 47 U.S.C. § 605. In *United States v. Cianfrani*, 573 F.2d 835, 855 (3rd Cir. 1978), it is stated that Title III has a twofold purpose: (1) to protect the privacy of oral and wire communications, and (2) to provide on a uniform basis the circumstances and conditions for the interception of such communications. It has been said that the statute is deemed to be the legislative enactment of the Fourth Amendment exclusionary rule and its purpose is to deter the invasion of an individual's privacy through the misconduct of officials by denying the fruits of their transgressions. *In Re Proceedings to Enforce Grand Jury Subpoenas*, 430 F. Supp. 1071 (E.D. Pa. 1977).

The provisions of Title III have been applied in cases involving a wide variety of factual circumstances. The problem presented in the case now before us is to apply Title III to a case involving a cordless telephone. The courts which have dealt with this specific problem have not been in agreement and have arrived at contrary conclusions. In *United States v. Hoffa*, 436 F.2d 1243 (7th Cir. 1970), *cert. denied* 400 U.S. 1000 (1971), FBI agents overheard calls made by defendant Hoffa placed from mobile telephone units located in automobiles owned by the union. They were monitored at the Detroit FBI office by means of ordinary commercial-type FM radio receivers. The court held that defendant had no expectation of privacy protected by the Fourth Amendment as to calls which originated from the mobile telephone in the automobile where the calls were exposed to everyone in that area who possessed an FM radio receiver or another automobile telephone tuned in to the same channel. The court cited *Alderman v. United States*, 394 U.S. 165, 22 L.Ed.2d 176, 89 S.Ct. 961 (1969); and *Katz v. United States*, 389 U.S. 347, 19 L.Ed.2d 576, 88 S.Ct. 507 (1967).

The issue arose again and was determined in a contrary manner in *United States v. Hall*, 488 F.2d 193 (9th Cir. 1973). There defendant Hall and others were charged with possession of marijuana with intent to distribute. Hall had radio-telephones installed in two automobiles. In early April 1971, a Tucson housewife, who listened to her radio while doing housework, intercepted the appellants' conversations on her radio, which was not unique. After eavesdropping for less than a month, she reported what she considered to be suspicious conversations to the Arizona Department of Public Safety. She continued to monitor the conversations and made reports to the department until May 21, 1971, when the department began its surveillance. For five weeks thereafter, the Arizona Department of Public Safety conducted warrantless electronic surveillance of the appellants' conversations which led to their arrests. The Court of Appeals held that Title III was the controlling statute in the case. It stated that if the interception in question fell within the parameters of Title III, the warrantless surveillance must be suppressed. The court stated that the threshold question was whether these radio-telephone conversations constituted an "oral communication" or a "wire communication." The answer was critical because the definition of oral communication includes the expectation of privacy language derived from *Katz v. United States*. In order for an oral communication to be protected by the Act, the speaker must have "an expectation that such communication is not subject to interception under circumstances justifying such expectation." 18 U.S.C.A. § 2510(2).

The court noted that a "wire communication" has no such restriction in its definition. It is defined in 18 U.S.C.A. § 2510(1) as "any communication made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception." The reason for the differentiation between a wire communication and an oral communication was stated in the following language:

"Obviously, there is a reason for the more restrictive definition of oral communications. When a person talks by telephone, he can reasonably assume privacy. That assumption may often be invalid for non-wire communications. Therefore, it is incumbent upon the participants in an oral communication to make a reasonable estimate of the privacy afforded them by their particular circumstances.

"The definition of wire communication is not free from ambiguity. '[C]ommunication made in whole or in part . . . through the use of facilities . . . by the aid of wire . . . between the point of origin and the point of reception . . . .' could be interpreted in several ways. For example it could be argued that if any wire is used to aid the communication, it must be deemed a wire communication. If these were followed to its conclusion, the use of a radio would be included in the definition because some wires are contained in the radio transmitter and receiver—thus communication would be aided 'in part' by the use of wire. However, such an interpretation would be inconsistent with the language of the immediately succeeding section which permits an agent of the FCC, in certain circumstances, 'to intercept a wire communication, or oral communication transmitted by radio . . . .' 18 U.S.C. § 2511(2)(b).

"Broadcasting communications into the air by radio waves is more analogous to carrying on an oral communication in a loud voice or with a megaphone than it is to the privacy afforded by a wire. As with any broadcast into the air, the invitation to listen is afforded to all those who can hear. In the instant case, the eavesdroppers merely tuned their radio receivers to the proper station. It is obvious that conversations initiated from a radio-telephone more logically fall within the category of 'oral communication.'

"By reading the sections together, we can only conclude that the Congress did not mean that every conversation aided in any part by any wire would be a wire communication. As a radio broadcast must be deemed an oral conversation, we believe it would strain the legislative intent to hold that conversations emanating from a radio telephone would not be treated similarly." pp. 196-97.

The court in *Hall* thus reasoned that conversations emanating from a radio-telephone should logically be treated in the same way as an oral communication.

The court then noted some of the conversations were between two radio-telephones while others were between a radio-telephone and a regular land-line telephone. It stated that while the former are within the definition of oral communications, the use of a land-line telephone at one end of the conversation raises a serious question as to the defined category in which such a communication belongs. The court stated that while logic may dictate the same rule should apply when a conversation crosses the airways but initiates or terminates on a land line, it was not free to reach that result if the legislative intent is to the contrary. In view of the definition of "wire communication" in 18 U.S.C.A. § 2510(1), which was an indication of Congressional intent, it was forced to conclude that, "when part of a communication is carried to or from a land-line telephone, the entire conversation is a wire communication and a search warrant is required." p. 197.

The court then proceeded to criticize its final conclusion, stating that it realized that its classification of a conversation between a mobile and land-line telephone as a wire communication produced what is considered to be an absurd result. It noted that these conversations were intercepted by an ordinary radio receiver and not by a phone tap. Logically, they should be afforded no more protection than those occurring between two radio transceivers. They should be oral communications. However, Congress's definition of a wire communication necessitated the conclusion that the communications were wire communications. The court also observed that there was nothing in the legislative history of Title III to indicate how Congress intended to treat a radio-telephone conversation. It concluded that, in the absence of such an indication, *if a conversation involves a land-line telephone,* it is a wire communication. It suggested that if any changes were to be made in the law, it was up to Congress. The court held, however, that conversations *not involving a land-line telephone,* were oral communications, not "wire communications." Because such oral conversations lacked the requisite expectation of privacy, prior authority to intercept was not required by the statute as to those conversations.

Several years after the decision in *United States v. Hall,* the Supreme Court of Florida had before it a case involving a telephone beeper communication. In *Dorsey v. State,* 402 So. 2d 1178 (Fla. 1981), the defendant's arrest stemmed from an investigation by the St. Petersburg police department into the operation of a narcotics ring headed by one John Bailey. The investigation began with the use of a paid informant, whose information prompted the police to monitor, by means of a radio scanner, messages received by Bailey and others on a "pocket pager" or "beeper" rented by Bailey. The beeper was a type of pocket pager which a person carries on his person and through which he may receive messages. This is accomplished when another person dials the telephone number of the company that distributes the beepers. The calling party hears a tone and thereafter has ten seconds in which to announce his message. This message is then converted into radio waves and transmitted to the party with the beeper and to any member of the public who has a radio tuned to this frequency. The receiving party can only listen to the message, since the beeper is a receiver and not

a transmitter. A "bearcat scanner," capable of receiving any programmed frequency, was used by the police to intercept these beeper messages. The defendants contended that a court order was necessary to legally intercept these communications under the Florida statutes which corresponded in relevant parts with those set forth in Title III. Since a court order was not obtained, the defendants contended that there was a wiretap and that all evidence acquired therefrom was also illegal and must be suppressed.

The Florida court recognized, but rejected, the decision in *United States v. Hall.* The court followed a well-settled rule in Florida that statutes must be construed so as to avoid absurd results. It then construed the Florida statute to avoid reaching a result that would require police officials to obtain a warrant or a court order to listen to the open and available airways. The court stated that the definition of "wire communications" must be interpreted in a common sense and reasonable manner. It held that the prohibition of interception of wire communications "made in whole or in part through the use of facilities for the transmission or communications by the aid of wire" applied only to so much of the communication as is actually transmitted by wire and not broadcast in a manner available to the public. It noted that, just as it would be absurd to include within the definition of "wire communication" a message broadcast over a public address system for everyone to hear, even though the communication is aided by certain wires, it would be equally absurd and asinine to include within that definition television or radio signals broadcast with no reasonable expectation of privacy and openly available for anyone with the proper receiving equipment to hear. The court emphasized the *broadcast* nature of such messages, and that one who sends beeper messages should know that such communications are open to any members of the public who wish to take the simple step of listening to them. Such signals thus lack any expectation of privacy. They are, by the very nature of being broadcast, communications unprotected by any constitutional right or by the Florida wiretap statute and are thus admissible into evidence.

When we turn to the factual circumstances in the present case as set forth above, it is clear that there was an interception of a communication. The crucial issue we must decide is whether the

communications intercepted were "wire communications" or "oral communication" as defined in 18 U.S.C.A. § 2510. If the intercepted conversations were "wire communications," then the district court was correct in suppressing the evidence, because no prior court authorization was obtained. If the conversations intercepted were "oral communications," then we must determine whether the defendants had a reasonable expectation of privacy under the circumstances.

From our study of the cases and the legislative history of Title III, we have concluded that the conversations in this case which were intercepted between the mobile unit and the base unit of the cordless telephone were not "wire communications" but fall into the category of "oral communications." In our judgment, *United States v. Hall* not only arrived at an absurd result but misconstrued the Congressional intent. In construing a statute, the fundamental rule of statutory construction, to which all others are subordinate, is that the purpose and intent of the legislature governs when that intent can be ascertained from the statute, even though words, phrases or clauses at some place in the statute must be omitted or inserted. *Farm & City Ins. Co. v. American Standard Ins. Co.*, 220 Kan. 325, Syl. ¶ 3, 552 P.2d 1363 (1976). In determining legislative intent, courts are not limited to a mere consideration of the language used, but look to the historical background of the enactment, the circumstances attending its passage, the purpose to be accomplished, and the effect the statute may have under the various constructions suggested. *Brown v. Keill*, 224 Kan. 195, Syl. ¶ 3, 580 P.2d 867 (1978). In order to ascertain the legislative intent, courts are not permitted to consider only an isolated part or parts of an act but are required to consider and construe together all parts thereof *in pari materia.* Another principle of statutory construction well recognized is that a statute should never be given a construction that leads to uncertainty, injustice, or confusion, if it is possible to construe it otherwise. *Coe v. Security National Ins. Co.*, 228 Kan. 624, 620 P.2d 1108 (1980). Furthermore, courts are not bound to an examination of the statutory language alone, but may properly inquire into the causes which impelled the statute's adoption, the objectives sought to be attained, the statute's historical background, and the effect the statute may have under the various constructions suggested. *State, ex rel., v. Kalb*, 218 Kan. 459, 464, 543 P.2d 872 (1975).

The Supreme Court of the United States has held that a statute should not be given a literal construction, if such construction is contrary to the legislative intent and leads to *absurd conclusions. United States v. Bryan,* 339 U.S. 323, 94 L.Ed. 884, 70 S.Ct. 724 (1950). The United States Supreme Court, like the courts of Kansas, also follows the rule that penal statutes are to be construed strictly. *F.C.C. v. American Broadcasting Co.,* 347 U.S. 284, 296, 98 L.Ed. 699, 74 S.Ct. 593 (1954). It cannot be denied that 18 U.S.C.A. § 2511, which makes it a crime to intercept or disclose communications in a manner prohibited by the act, is a penal statute. In *United States v. Hall,* the court recognized this, noting that its holding was ironic, since Title III involves stringent civil and criminal penalties for those who violate its provisions. In other words, the court observed, any citizen who listens to a mobile-telephone band does so at his own risk, and scores of mariners who listen to the ship-to-shore frequency, commonly used to call to a land-line telephone, commit criminal acts.

It seems logical to us that cordless telephone conversations, which may be heard by anyone listening on an ordinary radio receiver, should not be included within the definition of a "wire communication" under Title III. The Congressional purpose in enacting Title III has been discussed above. It was intended to incorporate the Fourth Amendment safeguards in the interception to human communications. *United States v. Mainello,* 345 F. Supp. 863 (E.D. N.Y. 1972). Title III was designed for a dual purpose—to protect the individual's right of privacy and to provide a uniform and systematic basis for the interception of human communications by the police authorities.

The American Bar Association Standards Relating to Electronic Surveillance § 1.1 declares:

"The objectives of standards relating to the use of electronic surveillance techniques should be the maintenance of privacy and the promotion of justice."

In the general commentary of the Advisory Committee at pages 21-22 of the Standards, it is stated that privacy and justice must be balanced in this area. The following language is used:

"Mr. Justice Frankfurter once observed of journeys in the law that often 'where one comes out on a case depends on where one goes in.' so it is in any examination of the many troublesome questions associated with the use of electronic surveillance techniques in the administration of justice and various

proposals for reform. All too often discussions of these questions, however, have tended to degenerate into arid debates between contending ideologies. At one extreme, some seem to believe that the social order depends almost exclusively on the penal law, and requires the capture, conviction and punishment of as many culprits as possible. Society's laws must be vindicated by appropriate expiation or measured deterrence and, if possible, the offender reformed. Privacy may be important, but justice is always paramount. At the other extreme, some seem to think that all criminal law is formalized vengeance, that incarceration is a pointless cruelty without meaning as expiation, deterring or reforming no one, embittering its victims more than it protects society, and inflicting less pain on the guilty than on innocent dependents. Justice is of little importance, while privacy is always paramount. Between these untenable extremes, there is, of course, a middle way. 'The adjustment between the rights of the individual and the rights of the community must depend upon the needs and conditions which exist at any given moment . . . .' A system of penal law must maintain, the Advisory Committee believes, both privacy and justice. Neither value can be dogmatically accorded priority. The problem is as the late Judge Learned Hand put it: there is 'no escape in each situation from balancing the conflicting interests at stake with as detached a temper as we can achieve."

After approaching the problem in as detached a temper as we can achieve, we have concluded that the term "wire communication," as defined in 18 U.S.C.A. § 2510(1), should be construed to apply only to that portion of a radio-telephone communication which is actually transmitted by the wire and not broadcast in a manner available to the public. We hold that those portions of the cordless telephone conversations intercepted by an ordinary FM radio in this case did not fall into the category of a "wire communication," but were in fact oral communications and that the rules pertaining to the interception of oral communications prescribed in Title III are applicable.

In the case before us, it is undisputed that there was an interception of an oral communication transmitted by radio. We hold that these defendants, who as owners of the cordless telephone had been fully advised by the owner's manual as to the nature of the equipment, had no reasonable expectation of privacy under the circumstances. We wish to emphasize, however, that this case does not involve the rights of a person on the other end of the telephone land-line who was speaking over a standard telephone and who was without knowledge that the defendants were the owners and users of a cordless telephone. In reaching this conclusion, we have followed what we believe to be the Congressional intent in the enactment of Title III—to protect the individual's rights of privacy and also to provide a uniform and

systematic method for the interception of human communications by police officials to protect the public from criminal activities. On the basis of this rationale, we hold that the trial court erred in suppressing the intercepted cordless telephone conversations and the evidence obtained pursuant to the search warrant.

The State in this appeal also presents to the court a question as to the admissibility of the recordings of the pen register which was installed by law enforcement personnel after obtaining court authorization for the installation. This issue was raised but not ruled on by the district court. At the hearing, the only evidence presented on this issue was.that the pen register was installed by court authority. Under the circumstances, there was no factual basis to challenge the admissibility of the recordings of the pen register. Furthermore, the law is clear that the utilization of a pen register does not violate the provisions of Title III. See *United States v. New York Telephone Co.*, 434 U.S. 159, 54 L.Ed.2d 376, 98 S.Ct. 364 (1977), where it was held that Title III does not govern the authorization by a federal district court for the installation and use of a pen register by federal law enforcement officers.

For the reasons set forth above, the case is reversed and remanded to the district court for trial or further proceedings.