IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 91-5077
_____

UNITED STATES OF AMERICA,
                              Plaintiff-Appellee,

versus

DAVID LEE SMITH,
                              Defendant-Appellant.

_____

Appeal from the United States District Court
for the Eastern District of Texas
_____

(November 12, 1992)

Before POLITZ, Chief Judge, and JOHNSON and JOLLY, Circuit
Judges.

JOHNSON, Circuit Judge:

David Lee Smith was convicted by a jury on five counts
arising out of his drug trafficking activities.  Smith raises two
issues on appeal.  First, he contends that all of the evidence
against him was discovered as a direct result of the interception
of his conversations over a cordless telephone.  Smith argues
that the interception of his conversations violated both Title
III of the Omnibus Crime and Control and Safe Streets Act of 1968
(Title III), 18 U.S.C. §§ 2510-2521, and the Fourth Amendment.
Second, Smith argues that the evidence was insufficient to
sustain his conviction on the charge that he used and carried a
firearm during and in relation to a drug trafficking crime.  This
Court disagrees with all of Smith's arguments and affirms his
conviction on all counts.

## I. FACTS AND PROCEDURAL HISTORY

David Lee Smith and Michael Varing were next-door neighbors. Varing had reason to believe that Smith was involved in some recent break-ins at Varing's house. Varing had witnessed Smith using a cordless telephone, and one of Varing's co-workers suggested that Varing eavesdrop on Smith's calls using a Bearcat scanner.[1] Varing did not overhear anything connecting Smith to the recent burglaries, instead he discovered that his neighbor was a drug dealer.

Varing contacted a friend in the Port Arthur police department and told him that Smith was trafficking in cocaine. Varing was "instructed" by the Port Arthur police to tape record Smith's calls, and the police provided Varing with some blank cassette tapes. On one occasion, members of the Port Arthur police department were present and assisted in intercepting and recording Smith's phone calls. The intercepted calls and the tape recordings made by Varing eventually led to the arrest of Smith and four other defendants on drug-trafficking charges.

Immediately after his arrest, Smith signed a consent form authorizing officers to search his residence. The search

---

[1] A Bearcat scanner is a type of radio receiver which allows the user to monitor a number of radio frequencies. The scanner sequentially monitors all programmed frequencies. When a conversation on one of these frequencies is picked up, the scanner locks in on that frequency to allow the user to listen in. Bearcat scanners, along with similar scanners made by competitors, are commercially available at most radio and electronics stores.

uncovered crack cocaine, drug paraphernalia, customer lists, and a loaded .38 calibre revolver.

Smith was convicted of one count of conspiracy to distribute cocaine, one count of using or carrying a firearm during or in relation to a drug trafficking crime, and three counts of using a telephone to cause or facilitate a drug felony. Smith appeals his conviction on all counts by raising two arguments. First, Smith argues that the interception of his cordless telephone conversations violated both Title III and the Fourth Amendment. Therefore, Smith contends that all evidence discovered as a result of these intercepted conversations should have been excluded by the trial court. Second, Smith argues that the evidence was insufficient to sustain his conviction on the firearms charge. Because Smith's second argument can be disposed of so easily, we will examine these issues in reverse order.

## II. DISCUSSION

### A. *The Firearms Charge*

Smith contends that the evidence was insufficient to sustain his conviction on the charge that he used and carried a firearm during and in relation to a drug trafficking crime. When evaluating the sufficiency of evidence on appeal, this Court considers the evidence in the light most favorable to the verdict. *Glasser v. United States*, 315 U.S. 60, 80 (1942). The standard is whether, given the evidence presented at trial, any rational trier of fact could have found the defendant guilty

beyond a reasonable doubt. *United States v. Ivy*, 929 F.2d 147 (5th Cir. 1991), *cert. denied*, 112 S.Ct. 234 (1991).

The jury found Smith was guilty of violating 18 U.S.C. § 924(c)(1). This code section provides in pertinent part that

> [w]hoever, during and in relation to any crime of violence or drug trafficking crime . . . , uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years . . . .

Smith argues that there was no evidence that he ever used or carried the handgun discovered at his residence. Such proof, however, is not required by § 924(c)(1). This Court has held that possession of a gun is sufficient to satisfy the statute's "use" requirement if possession is an integral part of the felony. *United States v. Robinson*, 857 F.2d 1006, 1010 (5th Cir. 1988). In *Robinson*, where several loaded guns were found in the defendant's residence along with money, drugs, and drug paraphernalia, this Court held that there was sufficient evidence for the jury to conclude that the guns were an integral part of the drug trafficking because they safeguarded the defendant's operation. *Id*. Smith's case is indistinguishable. Just as in *Robinson*, the police search of Smith's residence discovered crack cocaine, a large amount of cash, and various drug paraphernalia, in addition to the loaded handgun.

From these facts, a jury could have reasonably concluded that the gun was used to safeguard and facilitate Smith's drug

4

transactions.  Thus, the evidence was sufficient to sustain Smith's conviction on the firearms charge.

*B.   Smith's Cordless Telephone Conversations*

Finding no error in Smith's firearms conviction, we now turn to the more difficult question:  whether all of the evidence against him must be excluded because it was a direct result of the warrantless interception of Smith's conversations over a cordless telephone.

*1.   Title III*

Smith first argues that, under Title III, his conversations over the cordless phone were inadmissible as evidence and that, as such, the trial judge should have suppressed the tapes and all of the evidence gained by using the tapes.  The argument that Title III applies to cordless phone communications has been uniformly rejected by every court that has considered it.  *See, e.g.*, *Tyler v. Berodt*, 877 F.2d 705 (8th Cir. 1989); *State v. Howard*, 679 P.2d 197 (Kan. 1984); *State v. Delaurier*, 488 A.2d 688 (R.I. 1985); *State v. Smith*, 438 N.W.2d 571 (Wis. 1989).  This Court sees no reason to buck that trend.

Title III essentially prohibits the nonconsensual interception of "wire," "oral," and "electronic" communication without prior judicial approval.  *See* 18 U.S.C. § 2516-2518.  The statute prohibits an individual from willfully intercepting or attempting to intercept wire, oral, or electronic communications

5

and from willfully disclosing or using the contents of such communications obtained in violation of Title III. 18 U.S.C. § 2511(1). Violators are subject to criminal prosecution and may even be liable for monetary damages to the party whose communications were intercepted. 18 U.S.C. §§ 2511(1)(b), 2520.

More important for our purposes, Title III includes an exclusionary rule; illegally intercepted communications may not be introduced as evidence in any trial or hearing. 18 U.S.C. § 2515. Of course, this exclusionary rule only applies to communication that is "wire,"[2] "oral,"[3] or "electronic"[4] as defined in the statute. Although Title III expressly excludes cordless telephone transmissions from the definitions of "wire"

---

[2] According to Title III, the term "wire communication" is defined as
> any aural transfer made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception . . . furnished or operated by any person engaged as a common carrier in providing or operating such facilities for the transmission of interstate or foreign communications . . . , but such term does not include the radio portion of a cordless telephone communication that is transmitted between the cordless telephone handset and the base unit[.]

18 U.S.C. § 2510(1).

[3] The term "oral communication" is defined as "any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation." 18 U.S.C. § 2510(2).

[4] The term "electronic communication" is defined as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by wire, radio, electromagnetic, photoelectronic or photooptical system." The term "does not include . . . the radio portion of a cordless telephone communication that is transmitted between the cordless telephone handset and the base unit." 18 U.S.C. § 2510(12).

6

and "electronic" communication, Smith argues that his conversations are nonetheless entitled to Title III protection because they fit within the definition of "oral communications." Such an interpretation is out of step with both the plain language of Title III and with its legislative history.

By its own terms, Title III limits the definition of oral communication to "any oral communication uttered by a person." 18 U.S.C. § 2510(2). In this case, it was not Smith's actual utterances that were overheard and recorded by the Varings; it was a radio signal produced by Smith's cordless phone that was intercepted, and it was a reconstruction[5] of the conversation produced by the Bearcat scanner that was tape recorded. Thus, by the plain terms of the statute, Smith's cordless telephone conversations do not fit within the terms of "oral communication."

Lest one think this interpretation is too restrictive, we note that it is fully supported by the legislative history of the 1986 amendments to Title III.[6] The Senate Report on the 1986 amendments explained that "[i]n essence, an oral communication is one carried by sound waves, not by an electronic medium." S.

---

[5] The Bearcat scanner did not actually intercept the sound of Smith's voice. Instead, the cordless phone reduced the sound of Smith's voice to radio waves. These radio waves were picked up by the scanner. The scanner then reconstructed the sound waves of the conversation.

[6] Title III was amended by the Electronic Communications Privacy Act of 1986, Pub. L. No. 99-508, 100 Stat. 1848. Among other things, this Act amended the definitions of "wire" and "oral" communications and extended Title III protection to "electronic communications."

REP. No. 541, 99th Cong., 2d Sess. 13 (1986), *reprinted in* 1986 U.S.C.C.A.N. 3555, 3567 (emphasis added). The communication that Varing intercepted was carried by radio waves, not by sound waves. It is also important to note that the 1986 amendments expressly excluded cordless telephone conversations from the definitions of "wire" and "electronic" communications because Congress felt that it was "inappropriate to make the interception of such a communication a criminal offense" since some types of cordless communications can be so easily intercepted. *Id*. at 12, *reprinted in* 1986 U.S.C.C.A.N. 3555, 3566. It would have been pointless to amend Title III to exclude cordless communications from the definitions of "wire communications" and "electronic communications" if such communications are nonetheless covered by the term "oral communications."[7] Although it might be argued that this would not be the first time Congress has engaged in pointless activity, in this case at least, such an interpretation was clearly not Congress's intent.

*2. Fourth Amendment*

---

[7] Smith argued before the trial court that if Congress really intended to exclude cordless telephone communications from the definition of oral communications they could have done so expressly--as they did for wire and electronic communications. Although he does not press this argument before this Court, we note that his argument ignores the fact that every judicial decision dealing with the issue under the pre-1986 version of Title III had concluded that cordless telephone communications were already excluded from the definition of oral communication. *See, e.g.*, *State v. Howard*, 679 P.2d 197 (Kan. 1984); *State v. Delaurier*, 488 A.2d 688 (R.I. 1985). Since Congress left the definition of oral communication unchanged, it can be assumed that they approved of those earlier judicial interpretations.

The conclusion that Smith's cordless phone communications were not protected by Title III does not end our inquiry, however. Even if Congress has not chosen to extend statutory protection to cordless phone communications, we must still determine whether the Fourth Amendment offers Smith any protection.

The proponent of a motion to suppress has the burden of proving, by a preponderance of evidence, that the evidence in question was obtained in violation of his Fourth Amendment rights. *Rakas v. Illinois*, 439 U.S. 128, 131 n.1, 133-34 (1978); *United States v. Castaneda*, 951 F.2d 44, 47 (5th Cir. 1992). This Court reviews the district court's determination of underlying facts for clear error. Questions of law, however, are reviewed *de novo*. *United States v. Coleman*, 969 F.2d 126, 129 (5th Cir. 1992); *Castaneda*, 951 F.2d at 47. The question of whether an expectation of privacy is reasonable under the circumstances is a question of law. *Schowengerdt v. United States*, 944 F.2d 483, 488 (9th Cir. 1991); *United States v. Jefferson*, 925 F.2d 1242, 1248-49 (10th Cir.), *cert. denied*, 112 S.Ct. 238 (1991).

The legal standard that Smith must satisfy in order to show a Fourth Amendment violation is well established. First, he must show that a government activity intruded upon a reasonable expectation of privacy in such a significant way that the activity can be called a "search." Second, if a search has in fact occurred, Smith must show that the government intrusion was

9

unreasonable given the particular facts of the case.  *United States v. York*, 895 F.2d 1026, 1028 (5th Cir. 1990).  In this particular case, the key inquiry is whether the interception of Smith's phone calls constituted a search within the meaning of the Fourth Amendment.[8]

The definition of the term "search" has always been the source of some difficulty in Fourth Amendment jurisprudence.  *See* 1 WAYNE R. LaFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT 301 (1987).  In general terms, it has been said that a search occurs when the government infringes an expectation of privacy that society is prepared to consider reasonable.  *United States v. Jacobsen*, 466 U.S. 109, 113 (1984).  Smith argues that the interception of his cordless phone conversations was a search because he did not know how the cordless phone worked or that his conversations would not be private.  However, a subjective expectation of privacy does not, by itself, give rise to Fourth Amendment protection.  The expectation of privacy must be one that society is prepared to recognize as reasonable.

While it is true that the right to privacy in a personal conversation is generally a reasonable expectation, the actions

_____

[8]  Since the interception of Smith's communications took place without a warrant and none of the exigent circumstances justifying warrantless search were present, Smith would have little or no trouble satisfying the unreasonable search requirement.  *See Minnesota v. Olson*, 495 U.S. 91, 99-100 (1990); *Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984); *United States v. Capote-Capote*, 946 F.2d 1100, 1102 (5th Cir. 1991).  Thus, this case rises or falls on the issue of whether the interception of Smith's cordless phone calls was a search for Fourth Amendment purposes.

of the parties to the conversation may reduce this expectation to the point that it is no longer "reasonable." *See, e.g., United States v. Burns*, 624 F.2d 95 (10th Cir.), *cert. denied*, 449 U.S. 954 (1980) (holding that there was no reasonable expectation of privacy for a loud conversation in a hotel room that could be heard in adjoining rooms). "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz v. United States*, 389 U.S. 347, 351 (1967).

The Supreme Court has noted that what is really involved in Fourth Amendment analysis is our "societal understanding" about what deserves "protection from government invasion." *Oliver v. United States*, 466 U.S. 170, 178 (1984). In any consideration of the "societal understanding" about the privacy expectations of cordless phone users, it is perhaps instructive to note the important role that all forms of telecommunication, including various cordless systems, play in today's society. As early as 1967, the Supreme Court recognized the "vital role" that the telephone plays in modern communication. *Katz*, 389 U.S. at 352. No one would dispute that the importance of telecommunications today has outstripped anything imagined twenty five years ago. In recent years, one of the fastest growing areas in the field of telecommunications has been "wireless" technology. *See* Andrew Kupfer, *Phones That Will Work Anywhere*, FORTUNE, Aug. 24, 1992, at 100. Cordless phones, in particular, are threatening to outstrip sales of traditional land line telephones. Today, nearly half of

11

the 95 million U.S. households use cordless telephones, and more than 16 million new cordless phones are expected to be sold this year.  Anthony Ramirez, *More Range, Less Static in New Cordless Phones*, N.Y. TIMES, Sept. 12, 1992, § 1, at 11.  If, as some experts predict, we are moving inexorably toward a completely cordless telephone system, the decision as to whether cordless telephone conversations are protected by the Fourth Amendment may ultimately determine whether <u>any</u> telephone conversation is protected by the Fourth Amendment.

With this sobering thought in mind, we now turn to the application of established Fourth Amendment principles to the subject of cordless telephones.  From a Fourth Amendment standpoint, the problem with cordless phones is figuring out how to characterize them.  Are they more like traditional telephones or more like radio transmitters?  This difference is important because the Fourth Amendment clearly protects communications carried by land-based telephone lines.  *See Katz v. United States*, 389 U.S. 347 (1967).  On the other hand, pure radio communications are afforded no such protection because "[b]roadcasting communications into the air by radio waves is more analogous to carrying on an oral communication in a loud voice or with a megaphone than it is to the privacy afforded by a wire."  *United States v. Hall*, 488 F.2d 193, 196 (9th Cir. 1973); *see Goodall's Charter Bus Serv., Inc. v. San Diego Unified Sch. Dist.*, 178 Cal. Rptr. 21 (1981).

Cordless phones are difficult to characterize because they do not fit neatly into either category. In one sense, the cordless telephone is just what the name implies, a telephone. It looks and sounds like a normal land line telephone. When you use a cordless phone, you dial a telephone number and talk to the party on the other end of the line. In actual operation, however, the cordless phone actually uses a radio signal. The typical cordless phone consists of a base unit, attached to the land-based telephone line, and a mobile unit which transmits and receives the radio signals that carry the actual conversation to and from the base unit. *See generally* Alan Gadlin, Note, *Title III Protection for Wireless Telephones*, 1985 U. ILL. L. REV. 143 (1985); Kelley K. Hwang, Note, *The Admissibility of Evidence Obtained by Eavesdropping on Cordless Telephone Conversations*, 86 COLUM. L. REV. 323 (1986).

One of the first cases to deal specifically with the question of whether a user of a cordless phone has a reasonable expectation of privacy was *State v. Howard*, 679 P.2d 197 (Kan. 1984). In *Howard*, as in most of the cases dealing with the interception of cordless phone communications, the precise issue before the court was whether the interception of cordless phone conversations fell under Title III. *See also Tyler v. Berodt*, 877 F.2d 705 (8th Cir. 1989); *State v. Delaurier*, 488 A.2d 688 (R.I. 1985); *State v. Smith*, 438 N.W.2d 571 (Wis. 1989). The key inquiry in each of these cases was whether cordless phone conversations had a reasonable expectation of privacy so as to

13

fit within the statutory definition of "oral communications."[9]
Although we have concluded that both the plain text of Title III
and the legislative history of the 1986 amendments show that
Congress never intended to include cordless phone conversations
within the definition of "oral communication," the analysis of
the reasonableness found in the pre-amendment cases dealing with
Title III is virtually identical to the appropriate inquiry under
the Fourth Amendment.

In *Howard*, a neighbor overheard the defendant's cordless
telephone conversation on a standard AM/FM radio.  The
conversations indicated that Howard was involved in drug
trafficking so the neighbor recorded several conversations and
provided them to the police.  Based primarily upon the tape
recorded conversations, police obtained a search warrant for
Howard's residence where they discovered "certain narcotic
drugs."  *Howard*, 679 P.2d at 199.

---

[9]  As discussed earlier, the legislative history for the
1986 amendments makes it clear that the term "oral
communications" does not include cordless telephone
conversations.  Lacking this sort of illuminating legislative
history, cases dealing with the pre-1986 version of Title III all
focused on the "justified expectation of privacy" requirement
found in the definition of oral communication.  Because this
requirement was drawn from the "reasonable expectation of
privacy" developed for Fourth Amendment analysis, the test for a
Title III claim and a constitutional claim were basically the
same.  *See Tyler*, 877 F.2d at 706.  Now that Congress has made it
clear that "oral communication" does not include cordless
telephone conversations, our analysis must proceed differently.
Whether the user of a cordless telephone has a reasonable
expectation of privacy is now only relevant for Fourth Amendment
purposes.

14

At a hearing on Howard's motion to suppress, an employee of the manufacturer of Howard's cordless phone testified "as to the nature and operational dynamics" of the phone. *Id*. The witness testified that, because the cordless phone utilized a commercial radio frequency to communicate with the base unit, any standard FM radio could pick up conversations from the phone. The phone also had a range of up to 100 feet, depending on conditions. Further, this cordless phone, as well as other cordless phones in use at the time had a preset frequency. Any other cordless phone set to the same frequency could also pick up the same conversations. The only way to change the frequency of the phone was to return it to the factory for modification. *Id*.

After hearing this testimony, the *Howard* court held that the defendant could have had no reasonable expectation of privacy in his cordless phone communications because they could be heard by anyone listening on an ordinary radio receiver. As a result, the communications could not be considered "oral communications" under the pre-1986 version of Title III. *See also Delaurier*, 488 A.2d at 694 (holding that there could be no reasonable expectation of privacy for conversations "put on the air voluntarily, and accessible to anyone possessing an ordinary AM radio"); *Smith*, 438 N.W.2d at 573 (holding that user could have no reasonable expectation of privacy for conversations over a cordless phone where facts showed that phone had a range of over 700 feet and "was subject to ready interception by standard radio scanners, radio receivers, or other cordless telephones").

15

The essential holding of *Howard*--and of each of the other cases to consider the issue--was that, based upon the particular characteristics of the cordless phone in question, there could have been no reasonable expectation of privacy in the cordless phone transmissions due to the ease with which they could be monitored.  In other words, although the individual communication at issue would normally be subject to Fourth Amendment protection, the defendants had "knowingly exposed" the communication to the public by using a technology that could be so easily intercepted.  Nonetheless, these cases should not be read to stand for the proposition that a communication loses Fourth Amendment protection simply because it is not transmitted by wire.  There is nothing magical about a telephone line.  The significant difference between land line telephone conversations and conversations carried out over early versions of the cordless phone was the ease with which cordless phone conversations could be intercepted.  It was so easy to overhear early cordless phone conversations that a user could never have a reasonable expectation of privacy.

While we completely agree with these earlier decisions, it is important to note that since those cases were decided cordless technology has continued to evolve.  Today's cordless phones are very different from the models at issue in *Howard* and *Delaurier*. The effective range of cordless phones varies greatly from model to model; many are limited to a range of about sixty feet, barely beyond the average house or yard.  Obviously it is more

16

reasonable to expect privacy from a broadcast that cannot be heard outside your own property than it is to expect privacy for a broadcast that covers a whole neighborhood. Cordless phones are also no longer "pre-set" to one frequency. Instead, most cordless phones sold today can monitor all available frequencies and automatically select one that is unused. This greatly reduces the chance that a cordless phone will pick up conversations from other cordless phones. Today's cordless phones broadcast on radio frequencies not utilized by commercial radio so that conventional radios can no longer pick up cordless phone communication. Although radio scanners--like the one used by Mr. Varing--can still monitor most cordless phones, only a small percentage of people own such scanners. Surely the reasonableness of an expectation of privacy becomes greater when the conversation can only be intercepted using specialized equipment not possessed by the average citizen. Finally, cordless phones now appearing on the market actually scramble the radio signal so that even radio scanners cannot intercept the communication.

Courts should bear in mind that the issue is not whether it is conceivable that someone could eavesdrop on a conversation but whether it is reasonable to expect privacy. *See Florida v. Riley*, 488 U.S. 445, 453-54 (1989) (O'Connor, J., concurring). No matter how technologically advanced cordless communication becomes, some people will always find a way to eavesdrop on their

neighbors.[10]  However, "[t]he fact that [Listening] Toms abound

does not license the government to follow suit."  *United States*

*v. Kim*, 415 F. Supp. 1252, 1256 (D. Haw. 1976).  Although we

express no opinion as to what features or circumstances would be

necessary to give rise to a reasonable expectation of privacy, it

should be obvious that as technological advances make cordless

communications more private at some point such communication will

be entitled to Fourth Amendment protection.  Given this

conclusion, it should be equally obvious that it is not enough

for a trial court to conclude that interception of a conversation

does not implicate Fourth Amendment concerns simply because it is

carried by a "cordless" phone.  Application of the Fourth

Amendment in a given case will depend largely upon the specific

technology used, and a trial court must be prepared to consider

that technology in a hearing on a motion to suppress.

This is not a novel announcement.  Any determination of the

reasonableness of an individual's expectation of privacy is

necessarily fact intensive.  It is often said that "occupants who

leave window curtains or blinds open expose themselves to the

public's scrutiny of activities within that part of the house

that can be seen from outside the premises."  *United States v.*

---

[10]  The same holds true for land-based telephone lines.  The equipment needed to tap a regular telephone line can be purchased for less than $ 25 at Radio Shack (considerably less that the cost of a Bearcat scanner).  Yet if Congress for some reason removed land line telephones from the reach of Title III, this would not mean that there would be no Fourth Amendment protection for telephones.  The fact that some individuals eavesdrop on regular telephone conversations does not mean that no one has a reasonable expectation of privacy for ordinary phone calls.

*York*, 895 F.2d 1026, 1029 (5th Cir. 1990).  Yet this does not mean that the Fourth Amendment never applies when the curtains are open.

In *United States v. Kim*, 415 F. Supp. 1252 (D. Haw. 1976), FBI agents had used an 800 millimeter telescope to observe activities inside Kim's high-rise apartment from a quarter of a mile away.  There were no buildings in the line of sight located significantly closer.  The district court categorically rejected the government's argument that because Kim left his curtains open his activities were in plain view.  *Id*. at 1256.  In spite of the fact that the curtains were open, the circumstances clearly established that Kim nonetheless had a reasonable expectation of privacy in his home.  *Accord United States v. Taborda*, 635 F.2d 131, 138 (2d Cir. 1980); *Wheeler v. State*, 659 S.W.2d 381, 389-90 (Tex. Crim. App. 1982); *see also National Treasury Employees Union v. Von Raab*, 816 F.2d 170, 175 (5th Cir. 1987) ("An individual . . . may open the curtains of his home to the view of unenhanced vision without consenting to the view of a telescope.").

Likewise, in spite of the fact that a defendant uses a cordless phone, the circumstances may show that he also has a reasonable expectation of privacy.  When faced with a motion to suppress intercepted cordless phone communications, a trial court must do more than simply conclude that a defendant had no expectation of privacy because he used a cordless phone; instead, the trial court must be prepared to consider the

19

reasonableness of the privacy expectation in light of all the particular circumstances and the particular phone at issue. Granted, it would be easier to apply a general rule that it either is or is not reasonable to expect privacy for cordless telephone communications. The creation of such a general rule, however, is beyond the proper role of the judiciary. "Courts are as a general matter in the business of applying settled principles and precedents of law to the disputes that come to the bar." *James B. Beam Distilling Co. v. Georgia*, 111 S.Ct. 2439, 2442 (1991). Having said that, we now turn to an application of the law to the specific facts and circumstances present in this case.

Smith argued before the trial court that the interception of his cordless telephone conversations violated his Fourth Amendment rights. However, he introduced no evidence that could support this argument. His arguments before the trial court, and the bulk of his arguments before this Court, all revolved around the fact that Smith did not know that his conversations would not be private. Yet, subjective expectations of privacy are not enough to give rise to Fourth Amendment protection. The real question is whether Smith's subjective expectation of privacy is one that society is prepared to recognize as reasonable. As discussed earlier, the reasonableness of any expectation of privacy for a cordless phone conversation will depend, in large part, upon the specific telephone at issue. As the proponent of the motion to suppress, the burden was on Smith to show that the

evidence in this case was obtained in violation of his Fourth Amendment rights. Yet Smith introduced absolutely no evidence--such as the phone's frequency or range--that would tend to show that his subjective expectation of privacy was reasonable. Our discussion in this case has gone into great detail because it appears from the record that the trial court incorrectly assumed that there could never be a reasonable expectation of privacy for a cordless phone communication. Even under a correct application of the law, however, Smith failed to carry his burden of showing that his Fourth Amendment rights were violated. Smith's motion to suppress was properly denied.

## III. CONCLUSION

For the reasons stated, we hold that the evidence was sufficient to sustain Smith's conviction on the charge that he used and carried a firearm during and in relation to a drug trafficking crime. As to Smith's objections to the evidence obtained as a result of the interception of Smith's cordless telephone conversations, we first hold that Title III does not apply to intercepted cordless phone conversations. Also, we conclude that Smith failed to carry his burden of showing that the evidence against him was obtained in violation of his Fourth Amendment rights. Accordingly, the judgment of the district court must be AFFIRMED.

21