632 So.2d 623 (1994)
Joyce MOZO, and Edgardo Mozo, Appellants,
v.
STATE of Florida, Appellee.
No. 92-0280.
District Court of Appeal of Florida, Fourth District.
January 19, 1994.
Rehearing and Rehearing Denied March 22, 1994.
*624 J. David Bogenschutz of Bogenschutz & Dutko, P.A., Fort Lauderdale, for appellants.
Robert A. Butterworth, Atty. Gen., Tallahassee, and Carol Cobourn Asbury, Asst. Atty. Gen., West Palm Beach, for appellee.
Rehearing and Rehearing En Banc Denied March 22, 1994.
ANSTEAD, Judge.
This case presents the question of whether the police may randomly intercept and listen to private conversations emanating from a person's home over a cordless telephone. We find such conversations are protected by the Florida Constitution and reverse and remand.

FACTS
The Mozos were arrested and informed against for possession of cocaine, possession of cannabis, and possession of drug paraphernalia. They moved to suppress evidence seized from their home in a search and claimed the search resulted from the government's illegal interception of private telephone calls in their home. After taking testimony and hearing argument, the court denied the motion, finding that the police acted lawfully in intercepting the cordless phone calls. The Mozos subsequently pleaded nolo contendere but reserved the right to appeal the court's ruling because a contrary ruling on the legal issue involved would be dispositive of the state's case against them.
The hearing on the Mozos' motion to suppress disclosed the following facts. On June 20, 1991, Detectives Mike Kapo and Patrick McGowan of the Plantation Police Department were in the area of the Harbor Town Apartment Complex using an electronic scanning device to monitor private telephone calls. It is not clear from the record why the detectives chose to surveil this particular complex. Their goal was to use the scanning device to scan frequencies at random hoping to come across some kind of illegal activity. According to Detective McGowan, this could be done by tuning the device in to different frequencies so various radio transmissions, such as from cordless phones, could be overheard. Detective Kapo purchased the scanner, made by Realistic, at Radio Shack on June 17, three days before the date in question. The purchase was made with funds furnished by the Plantation Police Department and, according to Detective Kapo, was approved by his sergeant for the express purpose of monitoring cordless phone calls.
On the night of June 20, the detectives intercepted numerous phone calls, including a phone call in which a female named "Joyce" was speaking to an unidentified male by cordless telephone. The male asked Joyce if "she had the same stuff that she had last *625 night." Joyce then turned away from the receiver and asked an unidentified person, "Do you have the same stuff as last night?" After receiving an answer, she responded into the receiver, "No, just has powder. No rock." At no time after eavesdropping in on this call did the officers attempt to obtain a court order to continue to monitor that frequency. Both detectives testified the reason they did not obtain such an order was because they believed that Florida's Security of Communications Act, Chapter 934, Florida Statutes (1989) did not apply, and therefore, they were legally entitled to intercept cordless phone conversations without one.
The detectives continued to monitor the same frequency throughout the evening, eventually hearing a female say, "[C]ome to my apartment. The entrance code is 120." The next day, June 21, 1991, the detectives learned entrance code 120 corresponded with an apartment rented to appellant Edgardo Mozo. Upon gathering this information, they began to visually surveil the apartment. In addition, they continued to monitor the same frequency, and even began to tape record the intercepted phone conversations. Once again, these procedures were followed without obtaining a warrant or court order. Furthermore, all calls were intercepted without the knowledge or consent of the callers. Eventually, after following the same procedures and intercepting a number of calls for one more day, Detective McGowan left to obtain a search warrant. He recited the above information, and added he observed a pattern of people arriving at the apartment and leaving shortly thereafter. Finding probable cause, the judge issued a search warrant for the Mozos' residence.
The detectives executed the warrant later that night and recovered an extensive list of physical evidence, including several contraband items. Mrs. Mozo was present in the apartment, along with three others, but Mr. Mozo was not.
The record is devoid of any description of the Mozos' cordless phone or how it operates, although the record does indicate there is a sticker on the bottom of the base unit containing the following statement:
This cordless telephone system operates on the part 1568 FCC Rules. Privacy of communication may not be insured when using this phone. Operation is subject to two conditions: 1. it may not interfere with radio communications. 2. it must accept any interference received including that which may cause undesirable operation. Complies with parts 1568 FCC Rules, FCC registration number.
There is no evidence indicating the Mozos' knowledge of this sticker.

STANDING OF APPELLANT EDGARDO MOZO
Initially, a question arises whether Mr. Mozo has standing to challenge the interception of the cordless phone conversations. He maintains he had a reasonable expectation of privacy in those phone calls. However, there is no evidence in the record demonstrating he was ever a party to any of the intercepted cordless phone conversations. The only testimony taken at the motion to suppress hearing with reference to the intercepted conversations was that of Detective McGowan, who described each intercepted call. Almost without exception, he testified it was Mrs. Mozo receiving the calls. Only one phone call fails to identify who received it.
In order to have standing to challenge the interception of the conversations, Mr. Mozo had to be either a party to the conversations or one whose premises served as the site of the surveillance which resulted in the interception. See Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969); see also State v. Eber, 502 So.2d 32 (Fla. 3d DCA) (where defendant was not an "aggrieved person," defined in section 934.02(9) as one "who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed," he lacked standing to challenge unlawful wiretap), rev. denied, 511 So.2d 299 (Fla.), and cert. denied, 484 U.S. 897, 108 S.Ct. 232, 98 L.Ed.2d 190 (1987); State v. Albano, 394 So.2d 1026 (Fla. 2d DCA 1981) (defendant lacked standing where he was not a party to any intercepted conversations nor were his premises the site of any electronic surveillance). Even though Mr. *626 Mozo was not a party to any of the conversations, the record shows the apartment from which the conversations emanated and the evidence seized was leased in his name. It is also apparently the state's position that Mr. Mozo's possession of the premises gives rise to his alleged possession of the illegal substances found therein. Thus, by virtue of his proprietary interest in the apartment, Mr. Mozo enjoyed a reasonable expectation of privacy that his apartment would not be under surveillance. Accordingly, we conclude he has standing to challenge the interception of cordless telephone conversations originating from the apartment rented under his name.[1]

LAW AND ANALYSIS
At issue is whether the privacy protections accorded traditional telephone usage should be extended to cordless telephones used in the privacy of one's home. Significantly, neither the United States Supreme Court nor the Florida Supreme Court has addressed the issue of whether the Fourth Amendment protects conversations on a cordless phone. In fact, the United States Supreme Court has declined to review a decision that ruled on this issue. See Tyler v. Berodt, 877 F.2d 705, 706-07 (8th Cir.1989), cert. denied, 493 U.S. 1022, 110 S.Ct. 723, 107 L.Ed.2d 743 (1990).
According to one source, nearly half of the 95 million United States households use cordless telephones. See United States v. Smith, 978 F.2d 171, 177 (5th Cir.1992) (citing Anthony Ramirez, More Range, Less Static in New Cordless Phones, N.Y. TIMES, Sept. 12, 1992, § 1, at 11), cert. denied, ___ U.S. ___, 113 S.Ct. 1620, 123 L.Ed.2d 179 (1993)). The recent explosion in cordless phone usage, coupled with the unique nature by which they function, has resulted in confusion over whether to characterize them as traditional telephones or radio transmitters. As stated by the Fifth Circuit Court of Appeals:
In one sense, the cordless telephone is just what the name implies, a telephone. It looks and sounds like a normal land line telephone. When you use a cordless phone, you dial a telephone number and talk to the party on the other end of the line. In actual operation, however, the cordless phone actually uses a radio signal. The typical cordless phone consists of a base unit, attached to the land-based telephone line, and a mobile unit which transmits and receives the radio signals that carry the actual conversation to and from the base unit.
Smith, 978 F.2d at 178. The Wisconsin Supreme Court described their operation in this way:
Weak signals are transmitted from the base unit and handset in all directions and may be intercepted within about one thousand feet by anyone who is listening with a scanner, compatible cordless telephone, or other radio receiver.
State v. Smith, 149 Wis.2d 89, 438 N.W.2d 571, 574 (1989).
The United States Supreme Court has long given explicit Fourth Amendment protection to private telephone conversations. In Lopez v. United States, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963), the Court retreated from its previous stance that a physical trespass must occur for there to be a search or seizure,[2] and held private telephone conversations were protected from electronic eavesdropping by the government. Chief Justice Warren explained in his concurrence:
In part, the Court rested its decision [in Olmstead v. United States] on considerations thought peculiar to wiretapping, i.e., the interception of telephonic communications. "The language of the amendment cannot be extended and expanded to include telephone wires, reaching to the whole world from the defendant's house or *627 office. The intervening wires are not part of his house or office, any more than are the highways along which they are stretched." 277 U.S. at 465, 48 S.Ct. at 568. "The reasonable view is that one who installs in his house a telephone instrument with connecting wires intends to project his voice to those quite outside, and that the wires beyond his house, and messages while passing over them, are not within the protection of the Fourth Amendment. Here those who intercepted the projected voices were not in the house of either party to the conversation." Id. at 466, 48 S.Ct. at 568.
The disingenuous artificiality of this analysis is surely plain. Although, arguably, face-to-face conversations in home or office are more intimately a part of the right to privacy than are telephonic conversations, see p. 1395, supra, any attempt to draw a constitutional distinction would ignore the plain realities of modern life, in which the telephone has assumed an indispensable role in free human communication.
373 U.S. at 458 n. 8, 83 S.Ct. at 1398 n. 8 (Warren, C.J., concurring). Subsequently, in Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the Court declared without equivocation:
One who occupies it [a public telephone booth], shuts the door behind him, and pays the toll that permits him to place a call is surely entitled to assume that the words he utters into the mouthpiece will not be broadcast to the world. To read the Constitution more narrowly is to ignore the vital role that the public telephone has come to play in private communication.
389 U.S. at 352, 88 S.Ct. at 512. Hence, there is no question that citizens enjoy a right of privacy in their private communications, including those conducted by telephone.
Florida case law has failed to address the issue of the right of privacy in private communications over a cordless phone. Indeed, in Dorsey v. State, 402 So.2d 1178 (Fla. 1981), where the court approved the interception of a beeper signal as it was transmitted by radio waves, the supreme court noted:
We do not reach any hypothetical questions involving more sophisticated methods of intercepting communications which in fact engender a reasonable expectation of privacy, such as land-line telephone messages transmitted in part by wireless signals.
Id. at 1184 n. 4.
The Mozos contend the nonconsensual interception of Mrs. Mozo's phone conversations without prior judicial approval violated the Florida Security of Communications Act, as well as their constitutional rights of privacy which are protected by the Act. The state responds by arguing that the Mozos had neither a subjective nor a reasonable expectation of privacy in these conversations because they took place over a cordless phone. Accordingly, it is necessary to analyze the Act, as well as the relevant state and federal constitutional provisions, in order to determine whether a citizen's cordless phone conversations are protected by law from government interception.

FLORIDA'S SECURITY OF COMMUNICATIONS ACT
The Florida Security of Communications Act was intended to flesh out the constitutional protections afforded private communications, while at the same time giving guidance to law enforcement as to the legitimate circumstances under which they may use the interception of communications as an investigative tool. See section 934.03(1)(a)-(d). Generally speaking, under the Act, all persons are prohibited from intercepting or disclosing the contents of any private wire, oral, or electronic communications. In order to fall within the protections of the Act, the communication must initially fit within the definition of a "wire," "oral," or "electronic" communication as described therein. Section 934.02(1) defines "wire communication" as:
any aural transfer made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between *628 the point of origin and the point of reception including the use of such connection in a switching station furnished or operated by any person engaged in providing or operating such facilities for the transmission of intrastate, interstate, or foreign communications or communications affecting intrastate, interstate, or foreign commerce. Such term includes any electronic storage of such communication but does not include the radio portion of a cordless telephone communication that is transmitted between the cordless telephone handset and the base unit.

(Emphasis added).
An "electronic communication" is defined in section 934.02(12) as:
any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects intrastate, interstate, or foreign commerce, but does not include:

(a) The radio portion of a cordless telephone communication that is transmitted between the cordless telephone handset and the base unit;

* * * * * *
(Emphasis added). The emphasized portions of the above definitions were added when Chapter 934 was amended in 1988. See Ch. 88-184, § 1, at 1016-17, Laws of Florida. As conceded by the Mozos, because the statutory definitions of a wire and electronic communication expressly exclude a cordless phone, the conversations at issue fall outside the coverage of those definitions.
The Mozos contend, however, that cordless phone conversations are covered by "oral communication" as protected and defined by section 934.02(2):
any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation and does not mean any public oral communication uttered at a public meeting or any electronic communication.
The Florida Supreme Court has interpreted the test set forth in the definition of "oral communication" as substantially the same as the constitutional test adopted by the United States Supreme Court in Katz:
The statute protects only those "oral communications" uttered by a person exhibiting an expectation of privacy under circumstances reasonably justifying such an expectation.

This expectation of privacy does not contemplate merely a subjective expectation on the part of the person making the uttered oral communication but rather contemplates a reasonable expectation of privacy. A reasonable expectation of privacy under a given set of circumstances depends upon one's actual subjective expectation of privacy as well as whether society is prepared to recognize this expectation as reasonable.
State v. Inciarrano, 473 So.2d 1272, 1275 (Fla. 1985) (emphasis in original); see also LaPorte v. State, 512 So.2d 984 (Fla. 2d DCA 1987) (where persons expected their conversations to be private, and the circumstances surrounding those conversations justified a finding that society was willing to accept that expectation as reasonable, the evidence satisfied the Inciarrano test, and the interception and recordation of those "oral communications" was unlawful), rev. denied, 519 So.2d 987 (Fla. 1988).
Initially, it seems the Mozos would be entitled to the same inference of privacy accorded to Mr. Katz in the public telephone booth. However, an examination of the actual wording of the statute, especially its exclusions, as well as the legislative history behind the Act, suggests a contrary result.
As noted above, cordless phones are expressly excluded from the definitions, and hence the protections, of wire and electronic communications under the statute. We believe it would make little sense to expressly exclude cordless phones from such protection if it was intended that cordless phone communications were nevertheless also protected as an "oral communication." In United States v. Smith, 978 F.2d 171, 175-76 (5th Cir.1992), the court construed the similar provisions of the federal act and explained:

*629 By its own terms, Title III limits the definition of oral communication to "any oral communication uttered by a person." 18 U.S.C. § 2510(2). In this case, it was not Smith's actual utterances that were overheard and recorded by the Varings; it was a radio signal produced by Smith's cordless phone that was intercepted, and it was a reconstruction of the conversation produced by the Bearcat scanner that was tape recorded. Thus, by the plain terms of the statute, Smith's cordless telephone conversations do not fit within the terms of "oral communication."
Lest one think this interpretation is too restrictive, we note that it is fully supported by the legislative history of the 1986 amendments to Title III. The Senate Report on the 1986 amendments explained that "[i]n essence, an oral communication is one carried by sound waves, not by an electronic medium." S.Rep. No. 541, 99th Cong., 2d Sess. 13 (1986), reprinted in 1986 U.S.C.C.A.N. 3555, 3567 (emphasis added). The communication that Varing intercepted was carried by radio waves, not by sound waves. It is also important to note that the 1986 amendments expressly excluded cordless telephone conversations from the definitions of "wire" and "electronic" communications because Congress felt that it was "inappropriate to make the interception of such a communication a criminal offense" since some types of cordless communications can be so easily intercepted. Id. at 12, reprinted in 1986 U.S.C.C.A.N. 3555, 3566. It would have been pointless to amend Title III to exclude cordless communications from the definitions of "wire communications" and "electronic communications" if such communications are nonetheless covered by the term "oral communication." Although it might be argued that this would not be the first time Congress has engaged in pointless activity, in this case at least, such an interpretation was clearly not Congress's intent.
(Footnotes omitted). These observations may also be applied to Florida's similar statutory scheme.
Florida's Security of Communications Act, when drafted in 1969, was modeled after Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (18 U.S.C. §§ 2510-2520).[3] The definition of "oral communication" in the Florida statute substantially follows the same language found in Title III. Compare 18 U.S.C. § 2510 (2) with section 934.03(2). Although our supreme court has held that in some respects the Florida Act "evinces a greater concern for the protection of one's privacy interests in a conversation than does the federal act," see State v. Tsavaris, 394 So.2d 418, 422 (Fla. 1981), receded from on other grounds, Dean v. State, 478 So.2d 38 (Fla. 1985), it is still instructive to consult the legislative history of the federal act, as well as cases decided thereunder, for guidance on the issue presented in this case.[4]
The legislative history to the 1986 Amendments of Title III reflects the legislature's explicit finding that because cordless telephones operate by radio waves, the "radio portions of these telephone calls can be intercepted with relative ease using standard AM radios." S.Rep. No. 541, 99th Cong., 2d Sess. (1986), reprinted in 1986 U.S.Code Cong'l & Admin.News 3555, 3563. Moreover, in adding the cordless phone exception to the definition of a "wire communication," the Senate recognized that "[b]ecause communications made on some cordless telephones can be intercepted easily with readily available technologies, such as an AM radio, it would be inappropriate to make the interception of such a communication a criminal offense" under Title III. Id. at 3566 (emphasis supplied). In reviewing this legislative history, two federal courts recently held the interception of cordless telephone conversations by radio scanner does not violate Title III. Smith, 978 F.2d at 175-76; United *630 States v. Carr, 805 F. Supp. 1266 (E.D.N.C. 1992).
Our legislature amended Chapter 934 in 1988, two years after Congress amended Title III. It is reasonable to assume the legislature was aware of the state of the law as it existed under Title III of the federal act both before and after its amendment, and made a conscious choice to include the cordless phone exceptions, presumably intending to follow the federal example. This conclusion is consistent with the results in other states faced with the decision of whether to adopt these exceptions. For instance, Wisconsin chose to include the exceptions in its statute's definition of "wire" and "electronic" communications when amended, also in 1988. Subsequently, the Wisconsin Supreme Court held that because of the amendment, there was no statutory protection for cordless telephone conversations. State v. Smith, supra. By contrast, the New York legislature declined to adopt the cordless phone exception for its definition of a "wire communication," and, consequently, New York courts have held communications by cordless phones are protected by statute. E.g. People v. Fata, 159 A.D.2d 180, 559 N.Y.S.2d 348 (N.Y. App. Div.), rev. denied, 76 N.Y.2d 985, 563 N.Y.S.2d 774, 565 N.E.2d 523 (N.Y. 1990).
Therefore, because it appears our legislature made a conscious choice to include, rather than leave out, a cordless phone exception, it is reasonable to assume it made a policy choice that our statute would be interpreted consistent with those of other states and the federal statute which contain the exact same exceptions. Accordingly, we hold cordless communications do not qualify as an "oral communication" under section 934.02(2) and thus fall outside the protection afforded by the Act.
However, that is not the end of our inquiry, since the Mozos claim they had both a state and federal constitutional right to privacy in the communications in question. The legislature, in enacting Chapter 934, and in amending its provisions, obviously cannot override provisions of the two constitutions.

STATE CONSTITUTIONAL PROTECTION
Recently, the Florida Supreme Court held Florida courts should first look to the provisions of the Florida Constitution in determining the nature and extent of the personal rights of Florida residents.[5]Traylor v. State, 596 So.2d 957 (Fla. 1992). In construing provisions of the Florida Constitution protecting personal rights, it is our duty to
focus primarily on factors that inhere in [our] own unique state experience, such as the express language of the constitutional provision, its formative history, both preexisting and developing state law, evolving customs, traditions and attitudes within the state, [our] state's own general history, and finally any external influences that may have shaped state law.
Id. at 962. In keeping with the "primacy principle" of Traylor, we begin our analysis by looking to the express language of the relevant provisions of the Florida Constitution.[6]
*631 Our state constitution contains at least two provisions concerning a person's right of privacy in communications: Article I, sections 12 and 23. Article I, section 12, presently provides:
The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, and against the unreasonable interception of private communications by any means, shall not be violated. No warrant shall be issued except upon probable cause, supported by affidavit, particularly describing the place or places to be searched, the person or persons, thing or things to be seized, the communication to be intercepted, and the nature of evidence to be obtained. This right shall be construed in conformity with the 4th Amendment to the United States Constitution, as interpreted by the United States Supreme Court. Articles or information obtained in violation of this right shall not be admissible in evidence if such articles or information would be inadmissible under decisions of the United States Supreme Court construing the 4th Amendment to the United States Constitution.
Article, I, section 12, Fla. Const. (1990). Although this general protection against unreasonable searches and seizures has been in our constitution since 1838, see Article 1, section 7, Fla. Const. (1838), the provision was amended in 1968 to specifically include protection for private communications. This protection appears to be unique among the states in that regard.
More importantly, our citizens voted in 1980 to add an explicit right of privacy to our state constitution. Article I, section 23, states:
Every natural person has the right to be let alone and free from governmental intrusion into his private life except as otherwise provided herein. This section shall not be construed to limit the public's right of access to public records and meetings as provided by law.
Together, sections 12 and 23 provide a very high degree of protection of private communications "from governmental intrusion."

SECTION 12
In Tollett v. State, 272 So.2d 490, 493 (Fla. 1973), the Florida Supreme Court declared:
In Florida, at least, the protection of privacy in the area of communications is constitutionally mandated in express language. This court is not at liberty to relax this protection afforded by the State Constitution.[7]
Initially, we note the plain text of section 12 protects citizens from "the unreasonable interception of private communications by any means, ... ." It is undisputed here that Mrs. Mozo was engaged in personal private communications in her home each time that her conversations were intercepted by the government. *632 Like the U.S. Supreme Court in Lopez, we believe a citizen's personal conversation remains private whether it is conducted face to face or by telephone.
It is also undisputed that there was no reason, such as suspicion of criminal activity, for the government to intercept Mrs. Mozo's calls or those of other residents in the area. It appears the use of "unreasonable" in section 12 refers to the government's interception, and not to any reasonable expectations or lack thereof by the person whose private communications are being intercepted. Hence, under a plain reading of the text of section 12 we believe Mrs. Mozo's conversations were protected from governmental intrusion.
Accordingly, we conclude the random interception of a cordless phone communication, without sufficient cause or suspicion, constitutes an unreasonable interception of a private communication in violation of article 1, section 12.

SECTION 23
We also believe Mrs. Mozo's communications were protected under section 23. To understand the nature of the right of privacy provided by section 23 it is helpful to examine the evolution of the federal right of privacy. Despite the fact that there is no express right of privacy in the United States Constitution,[8] the United States Supreme Court began to fashion an implied right of privacy out of the "penumbras" or "shadows" of various constitutional provisions. As a result, the Court has extended protection to one's right to make fundamental decisions concerning matters such as family, marriage, contraception, procreation, abortion, child rearing, and education. See Roe v. Wade, 410 U.S. 113, 152-53, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1973), limited on other grounds, Webster v. Reproductive Health Servs., 492 U.S. 490, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989); Griswold v. Connecticut, 381 U.S. 479, 485, 85 S.Ct. 1678, 1682, 14 L.Ed.2d 510 (1965), limited on other grounds, City of Dallas v. Stanglin, 490 U.S. 19, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989). The Court has also recognized the right of privacy involves an individual's interest in avoiding public disclosure of personal information. See Whalen v. Roe, 429 U.S. 589, 599-600, 97 S.Ct. 869, 876-77, 51 L.Ed.2d 64 (1977); Nixon v. Administrator of General Servs., 433 U.S. 425, 457-58, 97 S.Ct. 2777, 2797, 53 L.Ed.2d 867 (1977).
Notwithstanding, as the federal right of privacy was slowly taking shape, the Supreme Court made it clear that it considered this right a limited one. For instance, in Katz, the Court declared:
[T]he Fourth Amendment cannot be translated into a general constitutional "right to privacy." That Amendment protects individual privacy against certain kinds of governmental intrusion, but its protections go further, and often have nothing to do with privacy at all. Other provisions of the Constitution protect personal privacy from other forms of governmental invasion. But the protection of a person's general right to privacy  his right to be let alone by other people  is, like the protection of his property and of his very life, left largely to the law of the individual States.

Katz, 389 U.S. at 350-51, 88 S.Ct. at 510-11 (footnotes omitted) (emphasis added).
It is now well accepted that the inclusion of the phrase "right to be let alone" from government intrusion in Florida's privacy amendment was by no means unintentional. Professor Patricia Dore, who assisted in drafting the privacy amendment, has stated that the phrase was deliberately chosen as a means of distinguishing Florida's broad privacy right from the limited federal right announced in Katz. See Patricia A. Dore, Of Rights Lost and Gained, 6 Fla.St.U.L.Rev. 609, 652-53 n. 268 (1978), discussed in, Stall, 570 So.2d at 265 (Kogan, J., dissenting).
Hence, it has been held that Florida's right of privacy "embraces more privacy interests, and extends more protection to the individual *633 in those interests, than does the federal Constitution." In re T.W., 551 So.2d 1186, 1192 (Fla. 1989); see also Traylor, 596 So.2d at 961-62 (discussing the New Federalism and the distinctions between federal and state bills of rights). Indeed, the Florida Supreme Court has explicitly proclaimed:
The citizens of Florida opted for more protection from governmental intrusion when they approved article I, section 23, of the Florida Constitution. This amendment is an independent, freestanding constitutional provision which declares the fundamental right to privacy. Article I, section 23, was intentionally phrased in strong terms. The drafters of the amendment rejected the use of the words "unreasonable" or "unwarranted" before the phrase "governmental intrusion" in order to make the privacy right as strong as possible. Since the people of this state exercised their prerogative and enacted an amendment to the Florida Constitution which expressly and succinctly provides for a strong right of privacy not found in the United States Constitution, it can only be concluded that the right is much broader in scope than that of the Federal Constitution.
Winfield v. Division of Pari-Mutuel Wagering, 477 So.2d 544, 548 (Fla. 1985).
Although the Florida privacy amendment contains no express standard for reviewing the lawfulness of a government intrusion into one's private life, our supreme court has declared:
Since the privacy section as adopted contains no textual standard of review, it is important for us to identify an explicit standard to be applied in order to give proper force and effect to the amendment. The right of privacy is a fundamental right which we believe demands the compelling state interest standard. This test shifts the burden of proof to the state to justify an intrusion on privacy. The burden can be met by demonstrating that the challenged regulation serves a compelling state interest and accomplishes its goal through the use of the least intrusive means.
Id. at 547 (emphasis supplied). To be sure, this standard is the most exacting applied on review by the judiciary.[9]
A major analytical difficulty faced by the federal courts in the cordless phone cases decided under the Fourth Amendment appears to be applying the objective prong of the Katz formula: i.e., whether the defendant was reasonable in his belief of privacy. But, as Chief Justice Ehrlich has explained, under the Florida right of privacy, although the subjective belief must be legitimate, the separate and distinct test of a reasonable expectation of privacy is eliminated:
The words "unreasonable" or "unwarranted" harken back to the federal standard of "reasonable expectation of privacy," which protects an individual's expectation of privacy only when society recognizes that it is reasonable to do so. The deliberate omission of such words from article I, section *634 23, makes it clear that the Florida right of privacy was intended to protect an individual's expectation of privacy regardless of whether society recognizes that expectation as reasonable.

However, this emphasis on each individual's expectations of privacy does not mean that the individual's subjective expectations are dispositive of the applicability of article I, section 23. In Winfield, this Court characterized the interest protected as "an individual's legitimate expectation of privacy." Id. (emphasis added). Therefore, the zone of privacy covered by article I, section 23, can be determined only by reference to the expectations of each individual, and those expectations are protected provided they are not spurious or false.

Shaktman v. State, 553 So.2d 148, 153 (Fla. 1989) (Ehrlich, C.J., specially concurring) (emphasis added). Under this view, any margin of error with regard to the interpretation of the right of privacy in Florida should be in favor of the individual.
In the current case, we certainly cannot characterize the belief in privacy of the telephone calls in question as illegitimate or "spurious or false." That is, we cannot conclude it is "spurious or false" for a citizen to believe the government will not, without cause or suspicion, randomly listen in on her private telephone conversations and those of her neighbors. Indeed, while this practice may be a hallmark of a totalitarian society, it is the very antithesis of a free society. Hence, we conclude that under article I, section 23, a person's private conversations over a cordless telephone are presumptively protected from government interception.
We find this conclusion justified not only because a cordless phone is so similar in appearance and use to a traditional phone, but also because the Florida right of privacy specifically addresses protection from government intrusion. Article I, section 23, explicitly declares every natural person's right of privacy from "governmental intrusion into his private life." In our view, the question is not whether to make the innocent and accidental interception of cordless phone conversations "criminal," but rather to endorse the intentional and random government interception of citizens' private conversations over cordless phones because the interception may be "easy." Surely, no one would contend the government should be permitted to randomly listen in on private communications in the home simply because sophisticated listening devices are available in retail electronic stores.
We began our legal analysis of this case with the observation that ordinary phone conversations are clearly protected under both the Florida and Federal Constitutions. A cordless phone looks like and is operated the same as an ordinary phone. And, except for the radio signals from the handset to the base, a cordless phone works like an ordinary phone in a technical sense. Indeed, with the change in technology, cordless phones are now nearly as secure as traditional phones. In terms of government intrusion, for example, it would appear irrational to punish those who purchased a "first generation" cordless phone, more easily intercepted, compared to recent purchasers of more secure phones, especially when the appearance of all cordless phones is similar.[10]
Further, we view technology as an unsteady gauge to decide this case because its implications also cut the other way: in addition to cordless phones becoming more secure, technology has also provided easier means of intercepting traditional phones. Obviously, Mr. Katz was not really very secure in his public telephone booth. We would be naive to believe the government does not possess the technology to intercept most communications with relative ease. Indeed, if an "ease of interception" standard were applied there would be virtually no private communications, by wire-based telephone *635 or otherwise, that would be protected from the government's use of advanced technology to intercept private communications. It could even be argued that with this rough parity in ability to intercept, traditional phones should be treated like cordless phones, with no reasonable expectation of privacy, rather than cordless phones being treated more like traditional phones, with an expectation of privacy. For obvious reasons, this concept was rejected in Katz. Cf. Smith, 978 F.2d at 177 ("If, as some experts predict, we are moving inexorably toward a completely cordless telephone system, the decision as to whether cordless telephone conversations are protected by the Fourth Amendment may ultimately determine whether any telephone conversation is protected by the Fourth Amendment.") (emphasis in original).

CONCLUSION
Florida has chosen to explicitly protect the private communications of its citizens from unreasonable government intrusion by not one, but two, express and forceful provisions in its constitution. We apply those provisions today to private telephone conversations in the home, whether they be wire or cordless. In so holding, we adopt what we believe to be the good sense analysis of Chief Justice Warren, which we quoted earlier:
Although, arguably, face-to-face conversations in home or office are more intimately a part of the right to privacy than are telephonic conversations, see p. 1395, supra, any attempt to draw a constitutional distinction would ignore the plain realities of modern life, in which the telephone has assumed an indispensable role in free human communication.
See supra p. 627 (quoting Lopez v. United States, 373 U.S. 427, 458 n. 8, 83 S.Ct. 1381, 1398 n. 8, 10 L.Ed.2d 462 (1963) (Warren, C.J., concurring)). The "plain realities of modern life" are no less apparent or compelling today than they were when those words were penned in 1963.
Accordingly, for the reasons set out above we reverse and remand for further proceedings consistent herewith.[11]
PARIENTE, J., concurs.
FARMER, J., concurs specially with opinion.
FARMER, Judge, concurring with the result.
I see no need to decide whether the Florida Constitution would invalidate the police conduct here if, as I believe, the legislature has already done so by the statute construed today by the court. To reach that conclusion, I begin with a fairly basic principle of appellate adjudication. When there is an adequate statutory basis to resolve an issue on appeal, the court should not decide the issue on constitutional grounds. State ex rel. City of Casselberry v. Mager, 356 So.2d 267 (Fla. 1978) (courts always endeavor to preserve statutes and to avoid constitutional issues); Singletary v. State, 322 So.2d 551 (Fla. 1975) (courts should not pass upon the constitutionality of a statute if a case in which the question arises may be disposed of on other grounds). As a corollary to this rule of restraint, whenever possible courts should construe a statute so that it does not conflict with the constitution. Firestone v. News-Press Publishing Co. Inc., 538 So.2d 457 (Fla. 1989).
The statutory definition of "oral communications" is literally broad enough to embrace the kind of cordless telephone conversation involved here. Section 934.02(2), Florida Statutes (1991), defines a protected oral communication as "any communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation." The communication in this case fits prima facie within this statutory text.
This is the meaning that our supreme court has previously construed from this statute:

*636 "[it] protects only those `oral communications' uttered by a person exhibiting an expectation of privacy under circumstances reasonably justifying such an expectation.

This expectation of privacy does not contemplate merely a subjective expectation on the part of the person making the uttered oral communication but rather contemplates a reasonable expectation of privacy. A reasonable expectation of privacy under a given set of circumstances depends upon one's actual subjective expectation of privacy as well as whether society is prepared to recognize this expectation as reasonable." [e.o.]
State v. Inciarrano, 473 So.2d 1272, 1275 (Fla. 1985). Hence, properly construed, the statute means that when a proponent has shown circumstances of an expectation of privacy in the communication the issue becomes whether society is prepared to recognize that expectation as justifiable or reasonable.
The subject communication was a home telephone conversation on a cordless phone, with both the handset and the base in the home during the entire conversation. The majority seem to believe as a blanket proposition that society is not willing to recognize, through its legislative enactments, an expectation of privacy in this communication. The legislature, they posit, knew that current technology allows the easy interception of such communications by devices such as the one police here purchased from a consumer electronic equipment store. Because such interception is so readily available by technical devices widely available, and without a physical intrusion into the home itself, society is not willing to protect this kind of communication, they reason, by positive law. In other words the question of statutory protection, for them, is dependent on the advance of technology.
In my opinion, that analysis asks the wrong question. Instead, one might reasonably ask just what non-wire and non-electronic oral communication is NOT capable of being surreptitiously intercepted by current technology. In an age when satellites can photograph anything on the ground larger than a football and listen into virtually any telephone conversation, the commonly accessible listening devices for ordinary oral communications are no less advanced.
Electronic listening devices can record cats' paws on a carpet in the next room, or in the next building, or through mobile equipment in the next town. They can pluck from the heaving throng the hushed conversation of conspirators on a noonday street corner in the largest city. During the cold war, to have a truly private conversation in Moscow, the American ambassador had to have his talk in a special, soundproofed room in the basement of the American embassy, designed and built at great cost solely for that purpose.
New scientific marvels seem daily to press down on us in a blurring succession. What was a comic book dream just a few years ago in Dick Tracy and Flash Gordon is now routine. The rush of technological advance at the end of the 20th century is so great that it is unreasonable to suppose that the legislature decides a policy question so broad on something so evanescent as the current state of the art of electronic equipment. Indeed if technology is the measure of society's expectations, at the current rate advances threaten to consume not only any mythical statutory privacy rights but the real constitutional ones as well. Given the ease of technologic change, privacy could become a right only in an Orwellian, "newspeak", sense.
If someone is determined to eavesdrop on an oral communication in our time, it is nearly impossible  short of repairing to the White House or the American embassy in Moscow  to stop them. So if mere capability of interception is the critical test for protecting oral communications, then the statutory definition embraces an entire group of communications, quite literally, for which no expectation of privacy can any longer exist. The statute would thus make a promise of privacy that it immediately breaches in the next breath. We would have, in short, a legislative nullity.
It is precisely because of the nature and rapidity of change that the legislature selected for the category of oral communications *637 another test for privacy protection. In this third category, it focused not so much on the means for interception of this class of communication but on the surrounding circumstances of the individual communication. Unlike the nature of the statutory protection for wire and electronic communications, where all interceptions are per se forbidden, in oral communications we are directed to consider the kind, place and manner of any particular communication and ask whether these circumstances are such that Florida citizens would deem privacy crucial. The adoption of the privacy amendment[12] by our citizens in 1980 is the negation of the proposition that our society is not prepared to regard as private, no matter how cleverly it might be intercepted by the latest electronic gadget, that part of a cordless telephone conversation from handset to base that occurs entirely within a person's home.
A person's home is different. A conversation had exclusively within that home is presumptively not meant to be shared with persons outside. The fact that one conducts a personal interchange of ideas from that special place, that refuge, means that one intends the interchange to stay there. Should we recast Webster's formulation to say that a person's home may be modest, that the winds may blow through it, but the King of England may not enter there without permission  except if he can do so by the latest techno-marvel? Are we to expect that our legislators have said in a statute that one of the most common forms of personal conversations conducted in the home will be protected as private, except if someone can devise a technical means to eavesdrop on it? I do not think so.
I therefore believe that the omission of the cordless telephone exception, contained in the definitions of wire and electronic communications, from the third category of oral communications was not an oversight. The omission is not unreasonable and does not lead to absurd results unintended by the legislature. I think they knew exactly what they were doing. They wanted those who claimed protection for intercepted oral communications (but not those who claimed protection for intercepted wire and electronic communications) to be required to convince a judge that the communication at issue was of the kind that society would recognize the asserted expectation of privacy as reasonable. Because there is nothing about this home cordless telephone conversation, other than technology, to suggest that the expectation of privacy was unjustifiable, I conclude under the statute that this expectation is reasonable.
There is still another aspect of the majority's decision with which I disagree. I am generally not willing to construe statutes by the currently popular device of consulting what I regard as the tea leaves of legislative history. In this case the consultation is all the more tenuous because the precise "history" consulted is not even from the legislature that adopted the statute we construe. Here the history comes from another legislative body, the United States Congress. We are thus purporting to decide what our legislators intended, not from what they themselves have said in the text they adopted, but from what other legislators said in markup or debate on a proposed bill. For my taste, we might just as meaningfully send to know what the oracle at Delphi said.
I confess to standing with Justice Scalia about this use of legislative histories:
"The greatest defect of legislative history is its illegitimacy. We are governed by laws, not by the intentions of legislators. As the Court said in 1844: `The law as it passed is the will of the majority of both houses, and the only mode in which that will is spoken is in the act itself ... .' Aldridge v. Williams, 44 U.S. 9, 3 How. 9, 24, 11 L.Ed. 469 (emphasis added). But not the least of the defects of legislative history is its indeterminacy. If one were to search for an interpretive technique that, on the whole, was more likely to confuse than to clarify, one could hardly find a more promising candidate than legislative history." [e.o.]
Conroy v. Aniskoff, ___ U.S. ___, 113 S.Ct. 1562, 1567, 123 L.Ed.2d 229 (1993) (Scalia, J., *638 concurring). As he and others have observed, the use of the device is almost always selectively convenient  much akin to "entering a crowded cocktail party and looking over the heads of the guests for one's friends." Id. It is often a search for vindication rather than enlightenment.
Even if there was some logical validity to the endeavor, I should think that not even its most avid proponents would use a legislative history to conclude that a statute leads to unconstitutional results.[13] Rather I should think that this kind of analysis might be better used to save a statute from such invalidity. To the contrary, however, today we have given a new, unprecedented spin to the usage. The majority have concluded in effect that an ambiguous statute leads to invalid results. I could not subscribe to this conclusion even if I accepted the method.
I repeat. In exempting cordless telephone communications from the definitions of wire and electronic communications, I simply do not agree that the Florida legislature similarly meant to deny the statutory protection to oral communications. Acknowledging the ubiquity that cordless telephone conversations have today, such a holding is to tantamount to an intention not to protect most home telephone conversations. In this criminal prosecution, I would resolve any ambiguity caused by the exclusion from the two definitions, but not the one, in favor of the inclusion in the one. That is the construction that favors the accused.[14]
I therefore join in the reversal, if not the reasoning of the court.
NOTES
[1] The state also argues this court is barred from considering the merits of this case because the issue involved is not dispositive. Based on the record below, we reject this argument. See Howard v. State, 515 So.2d 346 (Fla. 1st DCA 1987) (a trial court's denial of a motion to suppress in a drug case is dispositive where the state has no other evidence with which it can proceed to trial against the defendant); Ruiz v. State, 416 So.2d 32 (Fla. 5th DCA 1982) (orders denying motions to suppress are presumptively dispositive).
[2] See Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928).
[3] In fact, the historical note to section 934.01 states: "With one exception the state law follows closely the Federal act." 23A Fla. Stat. Ann. 292 (1985) (Historical Note to § 934.01).
[4] In Tsavaris, the greater protection referred to was the requirement of the consent of all parties to a conversation in order to permit the legal recording of the conversation, as opposed to the federal act's requirement of the consent of just one of the parties. 394 So.2d at 422.
[5] Since our decision rests on state constitutional grounds, we do not analyze the issue presented under the Federal Constitution.
[6] At the outset, we reject the Mozos' claim that Mrs. Mozo's telephone conversations in her home are protected by the Florida Supreme Court's ruling in State v. Sarmiento, 397 So.2d 643 (Fla. 1981). In Sarmiento, the court held that article 1, section 12, of the state constitution barred the government's interception and recording of a person's private conversation in his home with a police informant. The court reasoned that:

To assume the risk that one who participates in a conversation held in the home might later reveal the contents of that conversation is one thing, but to assume the risk that uninvited and unknown eavesdroppers might clandestinely participate in that conversation and later reveal its contents is another, and indeed proves too much.
Id. at 645. However, in 1987 the Florida Supreme Court held Sarmiento had been overruled by the amendment of article 1, section 12, in 1982 which binds Florida courts, when applying section 12, to follow United States Supreme Court decisions construing the Fourth Amendment in similar fact situations. State v. Hume, 512 So.2d 185 (Fla. 1987); see also Madsen v. State, 502 So.2d 948 (Fla. 4th DCA 1987) (because Sarmiento predates the 1982 amendment, it is no longer viable), approved, 521 So.2d 110 (Fla. 1988).
In any case, we do not believe Sarmiento or its demise is controlling herein. Sarmiento involved the interception of an oral communication with the consent and cooperation of one of the parties to the conversation. Such a scenario is not involved in this case.
[7] In Tollett, the Florida Supreme Court recognized that because of the difference between the federal Fourth Amendment and the 1968 version of section 12, which explicitly protects private communications, "the Federal and pre-1968 Florida cases which are based upon the Fourth Amendment" cannot be considered controlling. In Tollett, the police secured an informant to engage in telephone conversations with the defendant and recorded the conversations. The Tollett court treated the use of the informant just like placing a "bug" on the defendant's calls and held:

The object of the new language in Section 12, Article I is to insure that before a wiretap is made a judicial officer will determine whether there is probable cause to make the tap. A citizen's privacy is supposed to be protected to the extent of having a magistrate determine in advance whether his private conversations should be "bugged" by the police because of suspected criminality. Captain Campbell did not take the trouble to have a judge determine in advance whether there was justification for the wiretap. He went ahead and made the "tap" without prior judicial approval. This is a circumvention of a citizens's right guaranteed by Section 12, Article I, and cannot be sanctioned.
Id. at 495-96 (emphasis in original). The specific decision in Tollett, like that in Sarmiento, may no longer be good law under the Florida Supreme Court's ruling in Hume. State v. Welker, 536 So.2d 1017 (Fla. 1988) (overruling the specific holding in Tollett). However, the court's observations with reference to the 1968 amendment and the pre-amendment law appear valid.
[8] In fact, "[n]owhere in the entire text of the federal Constitution does the word `privacy' appear." Stall v. State, 570 So.2d 257, 264 (Fla. 1990) (Kogan, J., dissenting) (citing Roe v. Wade, 410 U.S. 113, 152, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1973), limited on other grounds, Webster v. Reproductive Health Servs., 492 U.S. 490, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989)), cert. denied, Long v. Florida, ___ U.S. ___, 111 S.Ct. 2888, 115 L.Ed.2d 1054 (1991).
[9] The facts of this case readily demonstrate the state has fallen far short of satisfying this stringent standard. While the state obviously has a compelling interest in fighting crime, the interception of phone conversations, without cause, suspicion, or prior approval, is certainly not the least intrusive means of detecting criminal activity. How many hundreds or thousands of "innocent" calls would be heard in order to detect a call involving criminal activity? While the government may have the technical ability to listen in, it still possesses no "magic wand" to detect only criminal conversations.

Furthermore, we reject the state's contention that it has demonstrated a lack of privacy by the existence of an FCC sticker on the bottom of the base of the telephone in question. As previously noted, there is absolutely no evidence in the record as to the Mozos' knowledge of the sticker, including whether they saw the sticker and ignored it, whether they read the sticker and concluded that it was meaningless, or whether they read the sticker and concluded that others, including the government, may be listening to their conversations. We can only speculate as to where the phone came from, whether it was in the apartment when the Mozos rented the apartment, whether the phone was a gift to the Mozos and so on.
In any event, we do not believe knowledge of a sticker that includes the ambiguous notation that "Privacy of communication may not be insured" constitutes a waiver of a person's right of privacy. See State v. Sells, 582 So.2d 1244 (Fla. 4th DCA 1991) (The suspicion that one's privacy may be invaded does not waive the right to privacy). Indeed, it is unlikely that anyone would contend that such a sticker on a regular telephone would constitute such a waiver.
[10] A contrary holding would leave numerous other troubling questions: What happens to a person who calls from a wire-based phone to another person who receives or transfers the call to a cordless phone? What about the person who is a guest at a home who is offered a cordless phone to make a private call? Does the right of privacy come and go in such a haphazard fashion? Indeed, one can envision an Orwellian scene of a husband looking out the window and saying to his wife: "You can make your call now, Lois, the police scanner has just driven away."
[11] Since we have expressly construed a provision of our constitution, the supreme court will have discretionary jurisdiction over our decision pursuant to Florida Rule of Appellate Procedure 9.030(a)(2)(A)(ii). Therefore, there is no need to certify the issue in this case as one of great public importance.
[12] See Art. I, § 23, Fla. Const. (1980) ("Every natural person has the right to be let alone and free from governmental intrusion into his private life except as otherwise provided herein.").
[13] By unconstitutional results, I refer to the effect of the majority's construction of the statute. Under that construction the statute, in terms of constitutional imperative, is under-inclusive.
[14] See § 775.021(1), Fla. Stat. (1991).